ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff,

v.

SPORTSWEAR GROUP, LLC, Defendant.

Sportswear Group, LLC, Third–Party Plaintiff,

v.

Rampart Brokerage Corporation, and Robalo Enterprise, Inc., Third–Party Defendants. etc.

No. 98 Civ 6074 (DC).

United States District Court, S.D. New York.

Feb. 23, 2000.

Nicoletti Hornig & Sweeney, Royal Ins. Co. of America by John A.V. Nicoletti, New York City, for Plaintiff/Counter–Defendant.

Weg & Myers, P.C. by Brian A. Andrews, New York City, for Defendant/Counter–Claimant/Third–Party Plaintiff Sportswear Group, LLC.

Lustig & Brown by William C. Kelly, New York City, for Third–Party Defendant/Cross–Claimant Rampart Brokerage Corp.

## MEMORANDUM DECISION

CHIN, District Judge.

In February 1998 a container filled with ladies' dresses and jumpers was allegedly stolen from the yard area outside a New Jersey warehouse. Sportswear Group, LLC ("Sportswear"), the owner of the dresses and jumpers, filed a claim for the loss with its insurance company Royal Insurance Company of America ("Royal"). In response, Royal brought this action seeking a declaratory judgment that under the terms of the marine cargo insurance policy it issued to Sportswear it is not liable for Sportswear's claimed loss. Sportswear filed a counterclaim against Royal for a declaration that the loss was covered and brought a third-party complaint against both the broker that procured the insurance policy on Sportswear's behalf, Rampart Brokerage Corporation ("Rampart"), and the New Jersey warehouse, Robalo Enterprise, Inc. ("Robalo"). In its amended answer to the third-party complaint, Rampart asserted a claim against Royal for indemnification and cross-claims against Robalo for indemnification and apportionment of responsibility for the claimed loss.

Royal moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) against Sportswear, arguing that the marine cargo insurance policy at issue in this case does not cover Sportswear's loss as a matter of law. Sportswear cross-moves for judgment on the pleadings, pursuant to Fed. R.Civ.P. 12(c), or in the alternative for summary judgment, pursuant to Fed. R.Civ.P. 56, against Royal, contending that its loss is covered by the insurance policy. Rampart also cross-moves for judgment on the pleadings, contending that Sportswear's claims against it must be dismissed because Royal's insurance policy provides coverage for Sportswear's loss. Each of the three moving parties has indicated that its motion is based upon all the pleadings filed in this action.[1] For the reasons that follow Royal's motion for judgment on the pleadings is granted and the remaining motions are denied.

## BACKGROUND

Sportswear retained Rampart, a licensed insurance broker, to procure a marine cargo insurance policy on its behalf. (Third-party compl. ¶ 7). According to Sportswear, it sought to replace its existing policy, set to expire, with a new policy containing the same terms. On or about November 2, 1997, Rampart obtained Royal insurance policy POC 102586 (the "Policy") on behalf of Sportswear. (Compl. ¶ 8; Answer ¶ 4; Third-party compl. ¶ 9). The Policy is annexed to the Complaint as Exhibit 1.

On or about January 4, 1998, Sportswear purchased 1700 dozen ladies' dresses,

---

1. The pleadings in this action include: (1) the complaint ("Compl.") and exhibit thereto; (2) Sportswear's answer and counterclaim ("Answer"); (3) Royal's answer to the counterclaim ("Royal answer"); (4) Sportswear's third-party complaint ("Third-party compl."); (5) Rampart's amended answer to the third party complaint and counter/cross claims ("Rampart answer"); and (6) Royal's answer to Rampart's counterclaim ("Royal third-party answer"). Robalo has not answered or moved pursuant to Fed.R.Civ.P. 12(b) and thus appears to be in default.

packed in 1018 cartons, from Raiment Limited in Dhaka, Bangladesh. (Compl. ¶ 11; Answer ¶ 5). The following day, Sportswear purchased 400 dozen ladies' jumpers, packed in 200 cartons, from Borax Apparels, Limited, also located in Dhaka, Bangladesh. (Compl. ¶ 12; Answer ¶ 5). Both the dresses and the jumpers were placed in container number CATU 4082480 (the "container") and shipped aboard the vessel SOPHIE SCHULTE from Chittagong, Bangladesh. (Compl. ¶¶ 13, 14; Answer ¶ 6). The container was discharged from the SOPHIE SCHULTE in California and transported by rail to New Jersey where it was picked up by Jett Trucking and taken to a warehouse located at 333 Hamilton Road in South Plainfield, New Jersey (the "Warehouse"). (Compl. ¶¶ 15–16; Answer ¶¶ 2, 5, 7; Third-party compl. ¶ 10). The Warehouse is owned and operated by Robalo, the receiving agent Sportswear utilized for the storage and distribution of its shipments. (Compl. ¶¶ 7, 17; Answer ¶ 5; Third-party compl. ¶ 10).

It is undisputed that on February 16, 1998, Robalo's employee accepted the container from Jett Trucking and inserted a pin lock in the container chassis. (Compl. ¶ 19; Answer ¶ 10). According to Royal and Sportswear, Robalo did not have personnel on duty to unload the container at the time it inserted the pin lock; as a result, Robalo stored the container on its premises outside the warehouse.[2] (Compl. ¶ 16; Third-party compl. ¶ 10). At some point between the evening of February 16, 1998 and the morning of February 17, 1998, the container and its contents were stolen. (Compl. ¶ 21; Answer ¶ 11; Third-party compl. ¶ 10). Sportswear admits

that at the time the container and its contents were stolen they "were in the complete care, custody and control of Robalo," and "were no longer in the ordinary course of transit but rather had been delivered to the final destination." (Compl. ¶¶ 26, 27; Answer ¶ 15).

In their motions for judgment on the pleadings, both Sportswear and Rampart contend that Sportswear's stolen goods are insured under either Section I or III of the Policy.

Section I of the Policy contains the following "warehouse to warehouse" provision:

This insurance attaches from the time the goods leave the warehouse and/or store named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the Policy or until expiry of (15) days ... whichever shall first occur....

(Policy, § I ¶ 21, annexed to the Compl. as Exhibit 1). A marine extension clause provides coverage in case of "deviation, delay, forced discharge, reshipment and transshipment." (*Id.*, § I ¶ 22B). Section III of the Policy provides insurance coverage "while [the covered property is] temporarily stored in warehouses at locations listed in the attached Schedule." (*Id.*, § III, ¶ 1). Another paragraph in the same section further provides, "[c]overage here-

2. In its answer, Sportswear initially denied that "the container was delivered to the yard area of the Robalo warehouse" (Compl. ¶ 16; Answer ¶ 7) and that at the time the container was stolen it was "located in the unguarded and unfenced yard area outside of the Robalo warehouse." (Compl. ¶ 25; Answer ¶ 14). In its third-party complaint, however, Sportswear specifically alleges that: "ROBALO accepted said delivery even though it did not

have personnel on duty to unload the container. After accepting delivery, ROBALO caused the container to be stored on its premises outside the warehouse without adequate security. Subsequent to the receipt of the cargo and sometime between the hours of 7:30 P.M., February 16, and 7:30 A.M., February 17, 1998, the cargo was stolen." (Third-party compl. ¶ 10).

under applies only while Property Insured is located at the approved locations shown in the attached Schedule and only for amounts not exceeding the limits shown opposite each location." (*Id.*, § III, ¶ 3). The Policy's Schedule of Approved Locations lists only one location: "333 Hamilton Boulevard, Bldg 5A and 12, South Plainfield, N.J. 07080." Royal contends that because at the time the goods were allegedly stolen they (1) had been delivered to their final destination, and (2) were stored outside rather than inside the Warehouse, neither section of the Policy covers the loss.

### DISCUSSION

**A. Judgment on the Pleadings Standard**

■ The parties have moved for judgment on the pleadings. A motion for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c) is analyzed under the same standard applicable to a motion to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *Ad–Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987). Accordingly, judgment on the pleadings is appropriate only if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the pleadings that the moving party is entitled to judgment as a matter of law. *See United States v. Weisz*, 914 F.Supp. 1050, 1052 (S.D.N.Y.1996). In deciding a motion for judgment on the pleadings, a court may consider the pleadings and exhibits attached thereto, and statements or documents incorporated by reference in the pleadings. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Cue Fashions, Inc. v. LJS Distribution, Inc.*, 807 F.Supp. 334, 336 (S.D.N.Y.1992) (incorporating insurance policy by reference in motion for judgment on the pleadings). Because the Policy is annexed as an exhibit to the complaint, it is properly considered on this motion.

**B. Choice of Law**

■ As an initial matter, I must determine what law applies to the contract interpretation questions present in all three motions before me. The insurance policy issued by Royal to Sportswear is a maritime contract within the admiralty and maritime jurisdiction of this Court; accordingly, general federal maritime law applies. *See Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161–62 (2d Cir.1998); *New York Marine & Gen. Ins. Co. v. Tradeline*, No. 98 Civ. 7840, 1999 WL 1277244, at 3 (S.D.N.Y. Nov. 29, 1999). Pursuant to federal maritime law, the Court determines "the scope and validity of the [marine insurance] policy provisions [ ] involved and the consequences of breaching them" by looking to state law. *Advani*, 140 F.3d at 162 (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316, 75 S.Ct. 368, 99 L.Ed. 337 (1955)). Because this case falls within the Court's admiralty jurisdiction, federal choice-of-law rules control which state's law applies. *See id.; New York Marine*, 1999 WL 1277244 at 3. According to the Second Circuit,

> [u]nder federal choice-of-law rules, [the Court] determine[s] which state law to use by ascertaining and valuing points of contact between the transaction [giving rise to the cause of action] and the states or governments whose competing laws are involved. More concretely, this choice-of-law analysis should include an assessment of the following contacts: (1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*Advani*, 140 F.3d at 162 (internal quotations and citations omitted).

Royal contends that under this choice-of-law analysis New York law applies, and no party has argued otherwise.[3] I agree that New York law applies. Here, the insurance contract does not contain a choice-of-law provision. The contract was negotiated and issued through Rampart, a New York licensed insurance broker. (Third-party compl. ¶¶ 5, 9). Sportswear, the insured, is a New York corporation with its principal place of business in New York. (Answer ¶ 20). Although Royal is an Illinois corporation with its principal place of business in North Carolina, it maintains an office in New York. (Compl. ¶ 4). The policy contemplates world-wide coverage and the alleged theft occurred in New Jersey; nevertheless, balancing the factors, I conclude that New York has the most substantial contacts with the insurance policy at issue and that New York law governs the dispute.

## C. *Royal's Motion*

The crux of the dispute in this case is whether either Section I of the Policy, the warehouse to warehouse provision, or Section III of the Policy, the warehouse storage provision, covered Sportswear's goods at the time they were allegedly stolen from the yard area outside of the Warehouse. Royal contends that it is entitled to judgment as a matter of law because Sportswear's claimed loss is not covered under the Policy's clear, unambiguous language. In opposition, Sportswear and Rampart assert that: (1) the clear language of Section I of the Policy covers the loss because the goods remained in transit at the time of the alleged theft; (2) Section III of the Policy is ambiguous and thus must be construed against Royal; and (3) ambiguity in the Policy requires the Court to give effect to the parties' intentions and Sportswear's reasonable expectation of "seamless" coverage. Upon examination of the Policy I hold that its plain meaning forecloses re-

covery for Sportswear's claimed loss. Accordingly, Royal's motion is granted.

### 1. *Contract Interpretation*

Under New York law, "[u]nambiguous provisions of an insurance contract, as with any written contract, must be given their plain and ordinary meaning and the interpretation of such provisions is a question of law for the court." *Mazzuoccolo v. Cinelli,* 245 A.D.2d 245, 666 N.Y.S.2d 621, 622–23 (1st Dep't 1997) (internal citations omitted); *see Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1374 (E.D.N.Y.1988) ("[i]f the policy is unambiguous, its interpretation is strictly a question of law for the court"). Where, however, an insurance policy is ambiguous, the ambiguity is to be construed against the insurer and the Court may look to extrinsic evidence to ascertain the intent of the parties. *See Andy Warhol Found. for Visual Arts, Inc. v. Federal Ins. Co.,* 189 F.3d 208, 215 (2d Cir.1999); *Lavanant v. General Accident Ins. Co.,* 79 N.Y.2d 623, 584 N.Y.S.2d 744, 747, 595 N.E.2d 819 (1992); *Japour v. Ed Ryan & Sons Agency,* 215 A.D.2d 817, 625 N.Y.S.2d 750, 751–52 (3d Dep't 1995). Thus, the threshold question for this Court is whether the Policy is ambiguous.

An insurance contract is considered ambiguous where its terms are reasonably susceptible to more than one interpretation. *See Andy Warhol,* 189 F.3d at 215; *State v. Home Indem. Co.,* 66 N.Y.2d 669, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827 (1985). In contrast, "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Insurance Company of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)).

**3.** In their briefs, both Sportswear and Rampart rely primarily upon New York law with-
out addressing the choice-of-law question.

Moreover, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" *Id.* (quoting *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 (1957)).

### 2. *Application*

Applying the above rules of contract interpretation, and considering the admissions of the insured, I hold that neither Section I nor Section III of the Policy provides coverage for Sportswear's claimed loss. The parties spend much of their briefs discussing whether the goods were still "in transit" and had yet to reach their final destination such that the warehouse to warehouse provision in Section I of the Policy would apply to cover Sportswear's loss. In particular, the parties debate whether (1) Sportswear, through Robalo, exercised dominion over the goods such that it may fairly be said that delivery occurred, and (2) whether delivery remained incomplete until the goods reached the interior of the warehouse. In support of their arguments the parties cite and discuss several cases at length. The Court need not engage in such analysis.

In its answer, Sportswear admits that "[a]t the time container CATU 4082480 and its unknown contents were allegedly stolen, they were no longer in the ordinary course of transit but rather had been delivered to the final destination." (Compl. ¶ 27; Answer ¶ 15). Sportswear further admits that "[a]t the time container CATU 4082480 and its unknown contents were allegedly stolen, they were in the complete care, custody and control of Robalo." (Compl. ¶ 26; Answer ¶ 15). Thus, from the face of the pleadings Sportswear is precluded from arguing that Section I, which provides coverage "whilst

the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the Policy or until the expiry of (15) days ... whichever shall first occur," applies to cover its loss. (Policy § I, ¶ 21). Here, the pleadings unequivocally demonstrate that the goods were neither "in transit" nor "awaiting transit" but had been delivered to "the final warehouse." Hence, Section I does not apply.

Nor, from the face of the pleadings, does Section III of the Policy cover Sportswear's claimed loss. Section III provides for coverage while the goods are "temporarily stored in warehouses at locations listed in the attached Schedule." (Policy § III, ¶ 1). It later provides that "[c]overage hereunder applies only while Property Insured is located at the approved locations shown in the attached Schedule...." (*Id.* § III, ¶ 3). Sportswear and Rampart argue that Section III is ambiguous because the former paragraph provides coverage for goods "in" warehouses while the latter provides coverage when the goods are "at" the approved locations. They contend that the two provisions, when read together, create an ambiguity as to whether coverage attaches when the goods are placed inside the destination warehouse or merely when the goods are delivered to the warehouse property which includes the yard area outside the warehouse. This argument is buttressed, they assert, by use of the phrase "delivered to the final warehouse *at* the destination named in the policy" in Section I. (Policy, § I, ¶¶ 21, 22A) (emphasis added).

Sportswear and Rampart's reading of the Policy is not reasonable. When the words are given their plain and ordinary meanings, it is clear that the Policy contemplates coverage only while the goods are stored inside of warehouses. The term *"at"* the "approved locations" indicates that the parties contemplated that Sportswear might list more than one approved warehouse on the schedule annexed

to the Policy. Indeed, given that paragraph one of Section III itself states *"in warehouses at locations listed in the attached schedule,"* this is the only reasonable reading of the contract and the only reading that gives effect to every term in the Policy.[4] I reject Rampart's additional argument that to be unambiguous the Policy should have defined the term "warehouse" to include only the interior portion thereof. (Rampart Mem. p. 8). The first paragraph of Section III clearly and unambiguously provides coverage only when the property is located *in* warehouses. Accordingly, I hold that Section III of the Policy unambiguously provides coverage only for property temporarily stored "in warehouses," *i.e.,* inside of warehouses.

Because I do not find Section III of the Policy to be ambiguous, I do not reach the argument that ambiguities in the Policy should be construed in Sportswear's favor. Sportswear's final argument—that the parties intended "seamless coverage during all phases of shipping and storage" and therefore, regardless of the actual terms of the Policy, this Court should read the policy in a manner that does not create a coverage gap—is similarly unavailing. (Sportswear Reply Mem. p. 6). Examining the contract as a whole, I find that the purpose and intent of the contract is expressed in the clear, unambiguous terms of the Policy; accordingly, the Policy shall be enforced as written. *See Goldberg v. Manufacturers Life Ins. Co.,* 242 A.D.2d 175, 672 N.Y.S.2d 39, 44 (1st Dep't 1998) (where language in release is unambiguous, court gives effect to "expressed intent"); *Town of German Flats v. Aetna Cas. and Sur. Co.,* 174 A.D.2d 1003, 572 N.Y.S.2d 819, 820 (4th Dep't) ("[i]t is the

responsibility of the courts to enforce the clear and unambiguous provisions of an insurance contract as written"), *appeal denied,* 78 N.Y.2d 860, 576 N.Y.S.2d 218, 582 N.E.2d 601 (1991); *Miccio v. National Sur. Corp.,* 170 A.D.2d 937, 566 N.Y.S.2d 760, 762 (3d Dep't 1991) ("[w]hen the policy on its face is clear in its terms and the sense is manifest, any resort to rules of construction or extrinsic evidence of the parties' intent is improper. . . . where, as here, the provisions of the policy are clear, the contract of insurance must be enforced as written") (internal citation omitted). For all the above reasons, I hold that Royal is entitled to judgment as a matter of law. I note that Sportswear is not without a remedy; it may proceed on its third party complaint against Rampart and Robalo.

**D.** *Other Motions*

Both Sportswear and Rampart cross-moved for judgment on the pleadings solely on the ground that Sportswear's loss is covered by the Policy as a matter of law. Because I hold that Sportswear's claimed loss is not covered by the clear, unambiguous language of the Policy, both motions are denied.[5] Although Royal has not formally moved for judgment on the pleadings dismissing Rampart's claim against it—incorrectly labeled a counterclaim—to the extent the counterclaim seeks a declaration that the loss is covered it is dismissed with prejudice for the reasons stated above. To the extent the counterclaim somehow alleges negligence on the part of Royal it suffers from two defects: (1) it is improperly designated a counterclaim as Royal has not alleged any claims against Rampart, and (2) as currently pleaded it

---

4. Notably, the warehouse endorsement contained in Sportswear's expiring policy issued by Albany Insurance Company provided coverage for property lost "[w]hile temporarily stored within the continental limits of the United States" provided "the store or warehouse has been submitted to and approved by the [insurance] Company." (Third-party compl. ¶ 8).

5. Sportswear moved in the alternative for summary judgment and filed an unopposed Rule 56.1 statement. I note that because Sportswear is not entitled to coverage under the unambiguous terms of the Policy, and because I have taken the facts alleged in the pleadings in the light most favorable to Sportswear in deciding Royal's Rule 12(c) motion, converting the motion to one for summary judgment would not alter the result.

fails to state a claim as a matter of law. Accordingly, the counterclaim is dismissed without prejudice to Rampart's bringing suit against Royal for negligence if such a claim may properly be made.

### CONCLUSION

For the reasons stated herein, Royal's motion on the pleadings pursuant to Fed. R.Civ.P. 12(c) is granted and Royal is dismissed from the case. The cross-motions of Sportswear and Rampart are denied. The remaining parties shall appear for a conference on March 17, at 10:00 a.m. in Courtroom 11A, United States Courthouse, 500 Pearl Street, New York, New York 10007.

SO ORDERED.